Good morning, everyone. As you can see, two of us are here in person. Judge Miller will be participating by phone. Judge Miller, are you there? Yeah, good morning. Good morning. Thank you very much. Before we begin, the first two cases on our docket are submitted on the briefs at this And with that, we'll begin the argued cases in the order in which they appear on the docket, beginning with Akosung v. Barr. Good morning, Your Honors. May it please the Court, Ben Wiesner for Petitioner Yvette Akosung. I was waiting for the clock to start running. Your Honors, the key to understanding this case is credibility. My client was found to be credible. The Board did not disturb that finding. And so the following facts have to be taken as undisputed and uncontroverted. She was a single, childless woman. And only single, childless women can be married to the village chief. She was being forced to marry against her will. There's no question that this is not a proposed marriage or even a proposed arranged marriage. This was a forced marriage. She was living in hiding for over a year. Not living a normal life. She was living in hiding. She mentioned that twice, at least, on the record. Her family was harmed for her refusal of the marriage. Can I ask you a question about the social group? Yes, sir. I'm just trying to straighten out the record in my mind. Because your client appeared pro se before the IJ, the IJ proposed a social group. And then found that that group wasn't particular enough. And on appeal to the BIA, you contended that that group was particular enough. And I'm inclined to agree. But to us, I'm not sure what social group you're arguing. You proposed four additional social groups to the BIA. And you have a new one to us. But are you attacking the original proposed social group? I am, Judge. As a pro se. Your client actually did a pretty good job on it. Oh, she did. My concern is you. My concern is do your briefs attack the particular social group that the IJ proposed and rejected? The problem with- Yes? No? I mean, do your briefs attack that particular social group? About women being forced to marry? Yes. Yes, I do. Where in your briefs? Because, well, I state simply that it's the same group. I don't attack it. It's the same group. That single, childless women in Cameroon are the only people who must resist forced marriages. It's the same group worded differently. Okay. So your view is that the additional four groups that you propose are really the same group that the IJ turned down? Essentially, yes. All right. So tell me why the IJ's turning it down was error. Well, it was error because the facts are very clear that only single, childless women can be forced to be married. And the IJ said, well, this wasn't really a forced marriage. It was just a proposal. Right. Now, I'm assuming that it's a forced marriage. What's the evidence that the group is viewed as distinctive in society in Cameroon? Well, societies everywhere distinguish between a married woman and an unmarried woman. We have words for them. Widow. Bachelor. Every society that I know of distinguishes between married and unmarried people. Well, didn't your client also testify that she was subjected to? Right, right. Particular disrespect because of her membership in this group? Right, because two of her sisters could have also theoretically been married to the chief, but they were already married and had children of their own. So they simply weren't eligible. And I believe my client actually used that word, eligible, which suggests a rule, if not written down, at least an unwritten rule, that this is the rule. Only single, childless women may be forced to be married. Okay? And so, because she was by herself in front of the IJ. Let me ask a slightly different question. Has there ever been a claim that the persecution is simply on account of gender, which does not require a social group analysis specifically? Yeah, it does, actually. Gender is suggested as one of a particular social group in a matter of a costa. And so the analysis goes, okay, once you identified the immutable characteristic, in this case gender, then you ask, okay, well, what makes this person's gender in particular subjecting her to persecution? In this case, it's the fact that she was both single and childless. So that's the social distinction or social visibility as a part of the social group analysis, where the IJ just either didn't read the record enough or understand her testimony well enough, but she said it at least twice, only single, childless women can be forced to be married. Does that answer your question, Judge Graber? I think so, at least enough for the moment. Okay, very good. I'll move on. Excuse me. And so, basically, the board erred in not sending this back to the IJ when the board had a chance to correct the issue. The board knew that my client was on her own, was pro se before the IJ, and the IJ offered only this one formulation of a social group. By this point, a matter of WYC, I believe, had been issued, or at least very close to it. And the board is always harping, and the judges are always harping on immigration lawyers to clearly define your social group and any permutations thereof, and the judge simply just only offered this one. But that's what I'm asking you from the beginning. Isn't that one sufficient? In my opinion, yes. In my opinion, yes. Because, as I said, only single, childless women can be forced to marry. But I believe the ordinary remand rule from INS versus Ventura says that this case needs to go back to a judge with the proper social group, properly delineated, based on the facts and the record. And I'm not pulling this out of a country report. I'm not pulling this out of a letter. This is my client's credible testimony. And I wanted to ask you about relocation before you sat down. As I understand the record, your client says, I was fleeing, or in hiding, all the time I was in Cameroon, and I had to move from place to place because I thought they might, Defon, is that the way you pronounce it? I think so. Defon might find me. I looked in the record for country condition reports that suggested that there might be part of a country where his reach didn't extend. I didn't see those. Is there anything in the country condition reports which suggest that it would be safe for her to relocate somewhere else in Cameroon? No. The record is silent as to that particular issue. But where it's not silent is the fact that she was living in hiding. Right, and she testified, and the EIJ found her credible. I was just looking at the country condition reports. Sometimes they say there's discrimination against Muslims in the north of the country, but not in the south. I didn't see that here. No, no, and the record is silent as to that issue. Where it's not silent, though, is that women in Cameroon are subservient to men, and that is clear in my client's testimony and in the country reports. And so if she were to return, she would be subject to the laws that say, no, if you've been chosen to be a bride of a chief, you must obey that edict. Now, could she theoretically go somewhere else and maybe that doesn't happen? Well, maybe, but that's not the burden. The burden is, is it clearly possible that she can relocate without any fear of any prosecution? Well, at least on this record. If it went back to an EIJ, the record might be different. Yes. I'd like to save some of my time for rebuttal. Yes, you may do that. Thank you. May it please the Court, my name is Lindsay Pickle, and I represent the Attorney General. This is a case about relocation, and because Petitioner could relocate within Cameroon, that alone is dispositive here. They were looking for her everywhere she went. They were looking for her, but she was able to live for over a year. In hiding. Well, we don't know what hiding means. So hiding's a spectrum. Is it, I'm... Well, we know what it means because she testified she was in hiding, and the EIJ found her credible. Well, there's a spectrum there, Your Honor. So there's, is she hiding because she can't go back to her hometown? It just means I can never go back to my hometown. But she also testified they were busy looking for her, and she was kicked out of one cousin's home because they were afraid that they were coming for her, and there's a lot in there about the difficulty of being elsewhere in Cameroon. Well, she was able to go to school while she was there and live a practically pretty normal life. She testified that there was no evidence that she wanted to leave her uncles until he asked her to leave. I don't think there's anything in the record where she even suggested the actual conditions while she was at her uncles were insufficient or dangerous in any way. She testified, and she was found credible, that the Fonz edict goes throughout the country, that he had men looking for her to take him, take her back to him to be his forced bride, and that she had to relocate from place to place as she learned that people were attempting to locate her. That's pretty substantial evidence that relocation is difficult, isn't it? Well, she speculates that they'll find her no matter where she goes, but there's no evidence to support that in the record, and I think... Well, her testimony is evidence to support that in the record. Right, and so her factual assertions must be credited, but not her speculation. I also have a question about the Convention Against Torture claim, and it seems to me that the obvious result of her return would, assuming that we don't agree with you on relocation, is that she would indeed be forced to be wed to this person, and that that would constitute rape, which we have defined as torture. So why isn't the cat claim valid? Well, because of the relocation. So if you were to disagree that she was able to relocate, it would have to go back to the agency to decide in the first instance whether that was torture. Let's assume that we agree with her that she had demonstrated a likelihood of torture if returned to Cameroon, and that the government was either going to acquiesce or not interfere. On whom would be the burden to establish relocation then? Because there's no past persecution here, and she never contests that there was never past persecution, the burden is on her to show that... Even if there's a reasonable likelihood of future torture? The burden's on her to show that there's... Under a cat, the burden's on her? I believe so, Your Honor. I have a question about your previous answer. You said if we think that the cat analysis was wrong, we'd have to remand it. I don't understand why, because the BIA explained itself, denied the cat claim, and so I don't understand why we wouldn't, if we disagreed with it, simply say it's wrong. Why would it have to be remanded? So under Gonzales v. Thomas, it has to go to the agency in the first instance? Only if they haven't decided the issue, and they have decided the issue. We don't get to decide in the first instance, but if they decided and explained themselves and they're flat out wrong, we don't remand it. We tell them they were wrong. So I don't think there's anywhere in the record where they decided that forced marriage is or is not torture. They decided based on the relocation alone. That was the only reason they gave, though. And so if that reason is erroneous, aren't they done? They didn't say in the alternative she wouldn't experience future torture. But we don't know how the agency would decide the issue of whether forced marriage is torture, so it would need to go to the agency. Rape is torture. Have they not decided that? I believe so, Your Honor, but they have not decided if forced marriage is torture. Well, by definition, if you don't want to marry someone and don't want to have marital relations with them, then rape will occur. It would have to go to the agency in the first instance, so I couldn't speak to it. It would be beyond the scope of this petition. One of the points I wanted to make about the relocation is often the BIA is speculating about whether relocation is possible based on country reports or something like that. This is an even easier case because she actually did relocate and she had done it for over a year where she wasn't found and she wasn't harmed during that time. So is there a statute of limitations or something on this? In other words, if you're able to flee persecution for a certain period of time, you've established that relocation is possible? I mean, it's not as if she moved someplace and sent a letter to the fund that said, by the way, I've moved to Tucson. You can't get me. She's running during this two-year period. I don't understand how that establishes that relocation is reasonably possible. I don't think that there's a statute of limitations, but there is evidence that she was able to relocate safely, which the board credited or weighed very heavily in this case. See, my difficulty with that, and maybe let me ask it differently, is that you say there's evidence she was able to relocate safely, and really the evidence is she wasn't persecuted during that two-year period by the fund, correct? Well, there's other evidence, too. But if you couldn't relocate safely, then we'd have a very different case. So every time somebody runs away, it can't be that we've already established, if they're not found, that they can relocate safely. Well, Your Honor, the burden is on her to show that she couldn't reasonably relocate. And that's why I was asking about the cat. If she's shown that it's reasonably probable that she'll be tortured in the form of rape, is it really her burden to establish that there are other places in the country she can go to? So, because she has not established past persecution... No, I'm not talking about past persecution. I understand your asylum argument. I'm talking about your cat argument, the Convention Against Torture. If somebody says it's reasonably likely that I will be tortured if sent back to a place, it is then her burden also to establish that she couldn't relocate? So the Board relied on the relocation. I don't think they decided that it was torture, so we don't... But Judge Graber has indicated, and I think I agree with her, that under our case law, rape is torture. Forced marriage surely is rape. So if she's established that, who has to establish the possibility of relocation? Whose burden is it? So the relocation is part of the well-founded fear of persecution. You're still talking about persecution. I'm talking about torture. Okay, so it's still part of that. Well, okay. It would still have to go to the agency in the first instance, in that situation. But would the burden be on her to establish it, or would the burden be on the government to establish that she could relocate safely? I think the burden is still on her, but I can't say for sure. I can't say for sure either, which is why I'm asking you. I think the burden is still on her, but it would have to go to the agency to go through all that analysis in the first instance. Has the Board ever decided, as distinct from this Court, that rape constitutes torture? I believe that the Board has found that, Your Honor. But again, it would have to go to the Board in the first instance for the forced marriage part of it. Okay. And then the other point I wanted to make is that, for a particular social group, she is not established. So not only has she established that she couldn't relocate, she also hasn't established that she's not part of a particular social group. So the agency relied on the fact that there was no evidence in Cameroon society that her social group is distinct. So it's a proof issue. There is evidence. She testified that she was looked down upon and frowned on because she was a single, childless woman who refused the faun's advances. And that was found credible. So there was evidence. I don't think she ever testified that she was looked down upon by society. She just said that she was looked down upon by the faun and his servants. There's no evidence that the actual society and her neighbors and her peers thought of her as a distinct social group. So it's just a problem of proof in this instance. And again, turning to the CAT analysis convention against torture, she wouldn't have to show a particular social group there, would she? No, she wouldn't, Your Honor. But it would have to go to the agency in the first place. I understand. And I also want to note that the new social group that she proposes in her petition for review is much broader than any social group that she mentions before the agency. So it is basically women who could be selected for forced marriage, whereas before the agency they were looking at women who were selected for forced marriage and refused. So it's much broader. So it includes people who were selected for marriage by the faun and maybe wanted to marry the faun. It also includes women who were eligible to be selected by the faun, but were never selected. So it's a much broader social group than was ever analyzed by the agency in the first instance. Thank you, counsel. Your time has expired. Thank you. Judge Graber, I think you asked my colleague a trick question, unfortunately. The CAT regulations have no burden-shifting language regarding relocation. That wasn't me. And that's actually not a very old case, Barajas-Romero v. Lynch. I don't have the reporter's site in front of me, but it's case number 13-70520. The Ninth Circuit in this case held that the BIA erred in placing the burden on the petitioner to show the internal relocation was impossible, but then remanded it to the board to reconsider, quote, the CAT claim under the no burden-shifting relocation standard. Under CAT? Under CAT. Yeah, and that was my understanding, too. It's why I was confused. But under asylum claims, the burden is on the petitioner unless she shows past persecution. Or a well-founded fear of future persecution. That's Malconian. And then there is a rebuttable presumption that the fear or the danger exists throughout the country. And it's the government, then, who has to rebut that presumption. I notice that Judge Miller hasn't asked any questions. I wanted to give him an opportunity to do so. I appreciate that. I don't have any questions at this point. Thank you. Okay, very good. Email them into us. That was a joke. I caught him off guard. I don't really have anything else to say except that when my colleague brings up a spectrum of hiding, I think she's kind of pulling that out of thin air. This court, nor the board, nor any case that I know of has suggested that there's a spectrum of hiding, that some hiding is reasonable and others is not. So I think the court should reject that argument. But if there are no other questions, I'm out of time. Thank you. We appreciate that. Thank you both for your arguments. The case just argued is submitted. Thank you for coming to Phoenix, judges. It's our pleasure, especially when we come from a rainy climate. We appreciate the welcome.
judges: Graber, Hurwitz, Miller